# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DELNIECE JNAY WILLIAMS,

Defendant-Appellant.

UNPUBLISHED
January 29, 2015

No. 311262
Macomb Circuit Court
LC No. 2011-001089-FC

Before: BECKERING, P.J., and JANSEN and BOONSTRA, JJ.

PER CURIAM.

Defendant, Delniece Jnay Williams, appeals as of right her jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). Defendant was sentenced to life in prison without the possibility of parole for the first-degree felony murder conviction, and 70 months to 180 months' imprisonment for the first-degree child abuse conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises from the death of defendant's eight-month-old son, GW, following abuse and blunt force trauma inflicted upon him on October 11, 2010. GW's father testified that he and defendant shared custody of GW on a week-on, week-off basis. GW's father became concerned about GW's health during the week of September 21, 2010, when he began noticing bite marks and bruises on the child. He also noticed that when he touched GW's stomach, GW would cry, rather than giggle, which was unusual. These concerns prompted GW's father to contact Child Protective Services (CPS). He also took GW to the hospital for chest x-rays; the x-rays did not reveal any rib fractures.

At the time of GW's death, defendant, along with GW and her other son, JW, who was just shy of his third birthday, were staying with defendant's boyfriend, Aaron Matchett, at Matchett's aunt's house. Defendant and her children stayed with Matchett for approximately four days. On the Thursday that they arrived, Matchett recalled that defendant became upset with JW after he urinated on himself and on the carpet; defendant grabbed JW by the neck, picked him up off the floor, and then threw him in the air. Matchett testified that the next day, defendant gave JW "a look" whenever he came into the room and that JW would then walk or run away. Matchett also testified that, over the four days leading up to October 11, 2010, defendant gave GW three bottles of children's Ibuprofen; she gave him the medication after he

-1-

started crying or if he became upset. Matchett recalled that, while playing with GW, JW had headbutted and slapped GW. At some point on October 11, 2010, Matchett heard a "[p]retty loud" "thump" come from the bedroom where GW was sleeping. He asked defendant if anything was wrong, and she told him that he did not need to worry.

At approximately 4:00 p.m. on October 11, Matchett heard a scream or a cry originate from the room in which GW had been sleeping. He recalled that defendant grabbed a medicine bottle, gave some to GW, and attempted to give GW a bottle, but GW spit up the contents. At the suggestion of Matchett's mother, Matchett and defendant took GW to the hospital.

Dr. Richard Giovannini, an emergency room physician at Henry Ford Macomb Hospital, examined and treated GW. He indicated that when GW was brought in, he was essentially lifeless, unresponsive, and barely breathing; GW was placed on a ventilator to assist his breathing. He had a large subdural hematoma on his skull, and there was a large amount of swelling on his scalp. He also had a comminuted skull fracture, meaning that the bone had shattered, and there were multiple pieces causing bleeding and bruising on the brain. Dr. Giovannini observed broken blood vessels around GW's eyes, which Dr. Giovannini testified were indicative of trauma "[a]lmost all the time . . . ." In addition, GW had multiple bilateral rib fractures. Some of the rib fractures were displaced, which suggested that he had been subjected to a significant amount of force. An x-ray showed some calcification on the ribs, meaning that some of the rib fractures were older, and some were more recent.

Dr. Giovannini transferred GW to Children's Hospital in Detroit because his hospital was not capable of treating the extent of GW's severe injuries. Because of the old rib fractures, Dr. Giovannini contacted the police and CPS. Dr. Giovannini questioned defendant as to what happened, and she reported that GW was sick, had a fever, and suddenly became unresponsive. Dr. Giovannini indicated that defendant's demeanor was "nonchalant[,]" and she was not crying or asking questions about GW's care.

Officer John Biernat interviewed defendant at Henry Ford Hospital at approximately 6:00 p.m. on October 11, 2010. Defendant informed Biernat that GW had been running a fever. She recalled that she left GW after giving him a bottle at approximately 7:00 a.m., came back at approximately 4:30 p.m., and found GW unresponsive. Defendant indicated that JW striking GW may have been what caused the injuries, but she did not see what had happened to cause GW's injuries.

At approximately 2:00 a.m. on October 12, 2010, defendant spoke with Detective Robert Eidt of the Warren Police Department. Defendant initially gave a statement that was similar to the one she had given Biernat. After Eidt questioned how JW, a small child, could have inflicted GW's extensive injuries, defendant changed her story. She told Eidt that she had been holding GW in her arms when JW, who was running around, cut in front of her, causing her to take a wide step. Defendant then stepped on a toy, which caused her to slip, lose her balance, and drop GW onto his head from a height of approximately three to four feet. Defendant told Eidt that GW appeared to be fine at this point, so she put him in bed to take a nap, then returned three hours later at approximately 4:00 p.m. to find GW unresponsive. Based on defendant's statements and on facts gathered during the investigation and medical examination of GW, Eidt arrested defendant.

Later that same day, Sergeant Kenneth Marsee of the Warren Police Department interviewed defendant. Defendant initially told Marsee the story about how GW had fallen out of her arms. Sergeant Marsee explained that he believed the type of injuries GW suffered were typically involved with significant shaking or impact, not a short fall such as the one described by defendant. He then explained that he believed defendant was not telling the truth, and that it only takes a brief second to shake a baby violently. Marsee asked defendant if this is what happened, and she put her head down and said "yes." Marsee then asked defendant if she shook or threw GW, and defendant said that she threw GW so that he hit the bed, which was on the floor without a bed frame, and then fell off the bed onto the floor. Defendant said that she was sorry for what happened and that it should not have happened. GW did not survive his injuries.

Dr. Giovannini testified concerning GW's injuries and opined that a single drop from two to three feet could not have generated enough force to cause GW's injuries. He also did not believe that GW's injuries could have been caused by a two or three-year-old child headbutting GW. He believed that GW's injuries must have occurred within six hours of his arriving at the hospital, and most likely within one hour of coming to the hospital. He testified that the pattern of injuries GW suffered was "virtually diagnostic of child abuse." The fact that GW had both new and old rib fractures further supported Dr. Giovannini's conclusion that the fractures were the result of child abuse.

Dr. Francisco Diaz, an assistant medical examiner, performed GW's autopsy. He determined that the cause of death was multiple blunt force trauma and that the manner of death was homicide. His examination revealed extensive bleeding into the tissue beginning at the scalp, along with a comminuted fracture of the occipital bone, which is the bone in the back of the head. The bone was shattered, meaning that fragments of the skull were embedded into the brain tissue, causing the brain to swell. Dr. Diaz found a fracture of the parietal bone on the right side of the skull. In addition, he discovered a subdural hemorrhage.

Dr. Diaz also discovered several rib fractures, some of which were recent, and others of which had begun healing, which meant that they were inflicted weeks or months earlier. As a result of the rib fractures, GW suffered lung contusions. Dr. Diaz found several faint bruises on the child's back.

In Dr. Diaz's opinion, neither the actions of a child of JW's age nor a short fall could have caused the constellation of injuries that GW suffered. He also opined that the nature of skull injuries GW suffered suggested that there were two direct impacts to GW's head. The multiple rib fractures were the product of another impact. Dr. Diaz testified that there was multiple, wanton trauma to the head and chest.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to support her felony murder and first-degree child abuse convictions. We disagree. To determine whether there was sufficient evidence to support a conviction, this Court reviews the evidence de novo, in the light most favorable to the prosecutor, to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Odom*, 276 Mich App 407, 418; 740 NW2d 557 (2007). "This Court will not interfere with the trier of

fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

The elements of felony murder are:

(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b)]. [*People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999) (internal quotation marks and citation omitted).]

"The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id*. (internal citation omitted). First-degree child abuse is one of the enumerated felonies in the felony-murder statute. MCL 750.316(1)(b).

MCL 750.136b(2) provides the elements of first-degree child abuse: "A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." A "child" is a person who is less than 18 years of age and is not emancipated by operation of law. MCL 750.136b(1)(a). "Serious physical harm" is "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 705.136b(1)(f). First-degree child abuse requires the prosecutor to establish not only that the defendant intended to commit the act, but also that the defendant intended to cause serious physical harm or knew that serious physical harm would be caused by the act. *People v Maynor*, 470 Mich 289, 291; 683 NW2d 565 (2004).

Defendant argues that there was insufficient evidence to establish that she intended to cause serious physical harm or knew that serious physical harm would be caused by her acts. We disagree. "Intent and knowledge can be inferred from one's actions. When knowledge is an element of an offense, it includes both actual and constructive knowledge." *People v Gould*, 225 Mich App 79, 87; 570 NW2d 140 (1997). The nature and extent of the victim's injuries also provides circumstantial evidence of the defendant's intent. *People v Howard*, 226 Mich App 528, 550; 575 NW2d 16 (1997).

Here, when viewed in a light most favorable to the prosecution, there was sufficient evidence for a rational jury to find that defendant intended to cause serious physical harm to the child. As noted, defendant gave conflicting reports to hospital personnel and police officers about what happened to GW before ultimately admitting to intentionally throwing the eight-month-old infant. The child suffered from a panoply of serious, life-threatening injuries. Medical testimony established that GW suffered multiple severe injuries to his head and ribs.

The back of his skull was shattered, causing bone fragments to become embedded into his brain tissue. Another fracture to the right side of his skull caused a subdural hemorrhage. These massive injuries caused GW's brain to swell, leading to his death. GW also suffered multiple rib fractures. The volume and severity of GW's injuries, along with defendant's conflicting statements about how those injuries occurred, provided ample circumstantial evidence for a rational jury to conclude that defendant possessed the requisite intent. See *People v Magyar*, 250 Mich App 408, 418; 648 NW2d 215 (2002) (finding sufficient evidence to establish first-degree child abuse and felony murder where the "defendant intentionally struck the child victim on the head so forcefully as to cause serious brain damage and then knowingly brought about the circumstances that led to her death when he delayed medical treatment."); *Gould*, 225 Mich App at 87 (holding that the defendant's intent to harm the two-month old victim could be inferred where the defendant admitted shaking the victim and knowing that it was improper to do so and the victim suffered serious physical harm as a result of the shaking).

Additionally, and contrary to defendant's assertions, there was sufficient evidence for a rational jury to find that defendant caused GW's injuries. Defendant admitted to throwing the child. In addition, the evidence presented at trial suggests that defendant was the last individual to spend time alone with GW before his injuries were discovered. And, Matchett testified to hearing a loud "thump" emanate from a room in which GW and defendant were the only two occupants. Defendant suggests that there was insufficient evidence that she caused GW's injuries because her act of throwing GW onto the bed, from which he fell to the floor, would not have been forceful enough to cause his injuries given the medical testimony about the amount of force that must have been used. Defendant's argument ignores the standard of review for claims based on sufficiency of the evidence and essentially requests that this Court look at the evidence in a light most favorable to her. Defendant also ignores that the jury was not required to believe that defendant's statement about throwing the child onto the bed was either entirely true or entirely false. "[A] jury is free to believe or disbelieve, in whole *or in part,* any of the evidence presented." *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999) (emphasis added). The jury may have believed defendant's admission that she threw GW but disbelieved her claims that she only threw him onto the bed and that she only threw him one time. Indeed, the jury could have properly inferred from the medical testimony concerning the severe nature of GW's injuries that defendant threw or struck him more than once and with greater force than she admitted and that she did not merely throw him onto a mattress. See *People v Burks*, ___ Mich App ___, ___; ___ NW2d ___ (2014), slip op at 4 ("The fact that defendant claimed he merely struck the baby while performing CPR, and that this testimony conflicts with the other testimony in the case, does not render the evidence insufficient to convict defendant of felony murder and first-degree child abuse.").

Therefore, we conclude that the prosecution presented sufficient evidence to establish that defendant committed first-degree child abuse. There was also, then, sufficient evidence to establish the third element of felony murder, i.e., that defendant committed a felony enumerated in MCL 750.316(1)(b), namely, first-degree child abuse. Defendant does not challenge the first two elements of first-degree felony murder. In any event, the first element is established because GW was killed, and the second element is met because defendant's malice may be inferred from her act of throwing GW with enough force to cause his devastating injuries. See *Carines*, 460 Mich at 759 (malice may be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm).

### III. OTHER-ACTS EVIDENCE

Defendant next argues that the trial court improperly admitted evidence concerning GW's prior injuries and defendant's prior bad acts. Defendant failed to preserve this issue by making timely objections below. See *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004); *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003).[1] Therefore, our review is for plain error affecting substantial rights. *Jones*, 468 Mich at 355.

> To avoid forfeiture of an unpreserved, nonconstitutional plain error, the defendant bears the burden of establishing that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights. Once the defendant establishes these three elements, the appellate court must still exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. [*Id*. (citations omitted).]

"To establish that a plain error affected substantial rights, there must be a showing of prejudice, i.e., that the error affected the outcome of the lower-court proceedings. The defendant bears the burden of persuasion with respect to prejudice." *Id*. at 356 (citation omitted).

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"To be admissible under MRE 404(b), bad-acts evidence must satisfy three requirements: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *People v Kahley*, 277 Mich App 182, 184-185; 744 NW2d 194 (2007). Also, the trial court, on request, may instruct the jury regarding the limited use of the evidence. *People v Watson*, 245 Mich App 572, 577; 629 NW2d 411 (2001). See also *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

---

[1] Although defendant subsequently raised objections to some of the other-acts evidence, she did not preserve these issues because her objections were raised well after the evidence had already been admitted. An objection to the admission of evidence must be timely. MRE 103(a)(1). "[T]o be timely, an objection should be interposed between the question and the answer." *Jones*, 468 Mich at 355.

Although defendant argues that the evidence was inadmissible under MRE 404(b) because it did not comprise evidence of identity or of a common plan, scheme, or system in doing an act, this argument does not comport with any theory of relevance asserted by the prosecutor below in response to defendant's untimely objections. To the extent that defendant belatedly challenged below the admission of evidence of prior acts, the prosecutor argued for admissibility under *People v Delgado*, 404 Mich 76, 83; 273 NW2d 395 (1978), to tell the "complete story" of what occurred. We will analyze the issue in accord with the theory asserted.

"[E]vidence that is admissible for one purpose does not become inadmissible because its use for a different purpose would be precluded." *VanderVliet*, 444 Mich at 73. Therefore, MRE 404(b) does not preclude the introduction of evidence that is admissible for one purpose merely because that evidence also reflects that the defendant committed a separate bad act. See *id.*

> It is the nature of things that an event often does not occur singly and independently, isolated from all others, but, instead, is connected with some antecedent event from which the fact or event in question follows as an effect from a cause. When such is the case and the antecedent event incidentally involves the commission of another crime, the principle that the jury is entitled to hear the "complete story" ordinarily supports the admission of such evidence. [*Delgado*, 404 Mich at 83.]

Thus, evidence of another bad act may be admitted if it is so blended or connected with the charged crime that proof of one incidentally involves the other or the other act explains the circumstances of the charged crime. *Id*. "[I]t is essential that prosecutors and defendants be able to give the jury an intelligible presentation of the full context in which disputed events took place." *People v Sholl*, 453 Mich 730, 741; 556 NW2d 851 (1996). This *res gestae* principle is an exception to the general rule of MRE 404(b). See *People v Robinson*, 128 Mich App 338, 340; 340 NW2d 303 (1983).

Defendant challenges the admission of three items of evidence: testimony that GW had old, healed rib fractures; testimony that defendant picked up JW by the neck and threw him after he urinated on the carpet; and testimony that defendant gave GW three bottles of Ibuprofen in the days leading up to the infliction of the fatal injuries upon him. We conclude that defendant has not established a clear or obvious error that affected the outcome of trial.

## A. GW'S PRIOR INJURIES

The admission of the evidence of GW's prior, healed rib fractures was not a clear or obvious error. This evidence helped to tell the jury the "complete story" of what happened in connection with the charged offense.[2] Dr. Giovannini discovered the healed rib fractures during

---

[2] We note that defendant was not charged with any offenses arising out of GW's prior rib fractures, and that the jury was instructed, when considering the offense of first-degree child abuse, to only consider injuries inflicted on or about October 11, 2010, the date of GW's fatal injuries.

-7-

his examination of GW; he testified that those injuries contributed to the decision to contact authorities, which in turn led to the police investigation of this matter. Dr. Giovannini testified that the fact that there were both old and new rib fractures supported his conclusion that the fractures resulted from child abuse. The old rib fractures were also noted during the autopsy of GW. Admission of testimony concerning those injuries helped to tell the full story to the jury regarding the events surrounding the charged crime. See *People v Malone*, 287 Mich App 648, 661-662; 792 NW2d 7 (2010) (finding that the trial court did not abuse its discretion in admitting evidence that was offered to show the initiation of the investigation and how police officers came to focus on the defendant).[3]

But even if the admission of evidence concerning the old fractures was a clear or obvious error, the error did not affect the outcome. Defendant offers no reason to believe that the evidence of old rib fractures led the jury to convict her. As discussed, defendant *admitted* throwing GW on the date that he suffered the far more devastating skull fractures that led to his death. Moreover, defense counsel argued in closing that GW's father could have inflicted the old rib injuries, based on when they occurred. Defendant has not established that the admission of this evidence comprised a clear or obvious error that affected her substantial rights.

Defendant relies on *Knox*, 469 Mich at 512-514, in which our Supreme Court reversed felony murder and first-degree child abuse convictions based in part on the improper admission of evidence related to the victim's prior injuries. There was no indication in *Knox* that the evidence of prior injuries was admissible under *Delgado*. Instead, the Supreme Court determined that the evidence was relevant to prove that the subsequent fatal injuries were not inflicted accidentally, but that the trial court had allowed the prosecutor to use the prior injuries evidence for the improper purpose of convincing the jury that the defendant had caused the prior injuries despite the absence of evidence that the defendant had committed the past abuse. *Id*. at 513. Here, unlike in *Knox*, there was evidence that defendant may have inflicted GW's prior injuries, as GW's father testified that he believed the child may have been injured while in defendant's care, and that, after the child returned from defendant's care, the child was apprehensive about being touched in the abdomen. Moreover, in reversing the convictions in *Knox*, the Court emphasized that the case involved a close credibility contest with little hard evidence. *Id*. The defendant in *Knox* apparently did not make a confession. *Id*. In the instant case, defendant gave numerous inconsistent accounts to police, initially suggesting that her toddler may have caused the injuries, later claiming that she had accidentally dropped GW on his head, and then ultimately confessing that she had thrown GW on the date that he suffered the fatal head injuries; medical testimony indicated that a significant amount of force was required to inflict the injuries; and a loud thump was heard earlier in the day coming from the room in which defendant and GW were located. Because stronger evidence of guilt exists in this case as compared to *Knox*, we remain convinced that any error was not outcome-determinative. We further note that other evidentiary errors in addition to the admission of the victim's prior injuries led to the reversal in *Knox*. *Id*. at 512-515.

---

[3] In addition, we note that the evidence could be relevant to show that GW's fatal injuries were not the product of an accident.

## B. REMAINING OTHER-ACTS EVIDENCE

With regard to defendant's remaining assertions of error, assuming, without deciding,[4] that the trial court erred in admitting the evidence, defendant is not entitled to relief because she cannot demonstrate that the admission of the evidence was outcome determinative. The presentation of the evidence was relatively brief. Moreover, there was strong evidence of defendant's guilt. Defendant made several inconsistent statements regarding the possible cause of GW's injuries. Ultimately, she admitted to throwing GW, an eight-month-old infant, on the day of his fatal injuries. Her admission was corroborated, in part, by Matchett's testimony concerning the loud "thump" he heard when defendant was alone with GW. Testimony also established that defendant was the last person to check on GW before his injuries were discovered. In addition, the prosecution offered evidence that defendant had a flat affect and that she was "nonchalant" while speaking with emergency room personnel during the time GW was being treated for life-threatening injuries. As such, we conclude that, even assuming error, defendant cannot make the requisite showing of prejudice, i.e., that the error affected the outcome of the trial court proceedings. See *Jones*, 468 Mich at 355-356.

## IV. DOUBLE JEOPARDY

Defendant's next argument on appeal is that her convictions and sentences for first-degree child abuse and felony murder violate the constitutional prohibitions against double jeopardy. We disagree. "This Court reviews de novo questions of law, such as a double jeopardy challenge." *People v Gibbs*, 299 Mich App 473, 488; 830 NW2d 821 (2013).

> The prohibition against double jeopardy in both the federal and state constitutions protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. US Const, Am V; Const 1963, art 1, § 15; *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). The third of these protections exists to "protect the defendant from being sentenced to more punishment than the Legislature intended." *People v Meshell*, 265 Mich App 616, 628; 696 NW2d 754 (2005). [*Gibbs*, 299 Mich App at 488-489.]

"In *People v Smith*, 478 Mich 292, 315; 733 NW2d 351 (2007), our Supreme Court held that the 'same elements' test set forth in *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932), is the appropriate test to determine whether multiple punishments are barred by Const 1963, art 1, § 15." *People v Baker*, 288 Mich App 378, 381; 792 NW2d 420 (2010) (internal quotation marks omitted).

---

[4] We note, but do not address, MCL 768.27b(1) and the potential to admit evidence of other acts of domestic violence, which includes other instances of child abuse. In declining to address the evidence at issue under MCL 768.27b, we note that the evidence was not offered pursuant to the statute, and that the record does not contain evidence that the prosecutor provided the requisite pretrial notice of such evidence pursuant to MCL 768.27b(2).

The *Blockburger* test focuses on the statutory elements of the offense, without considering whether a substantial overlap exists in the proofs offered to establish the offense. If each offense requires proof of elements that the other does not, the *Blockburger* test is satisfied and no double jeopardy violation is involved. [*Baker*, 288 Mich App at 382 (citations omitted).]

Defendant contends that her convictions for both felony murder and the predicate offense of first-degree child abuse violated the multiple punishments prong of the prohibition against double jeopardy. We disagree. In *People v Ream*, 481 Mich 223, 225; 750 NW2d 536 (2008), our Supreme Court held "that convicting and sentencing a defendant for both felony murder and the predicate felony does not necessarily violate the 'multiple punishments' strand of the Double Jeopardy Clause." In *Ream*, the "defendant was convicted of both felony murder and first-degree criminal sexual conduct, where the latter constituted the predicate felony for the felony-murder conviction." *Id*. at 241. The Court noted that felony murder contained an element not included in first-degree criminal sexual conduct, namely, the killing of a human being, while first-degree criminal sexual conduct contained an element not necessarily included in felony murder, namely, a sexual penetration. *Id*. The Court explained that felony murder does not necessarily require proof of a sexual penetration because felony murder can be committed without also committing first-degree criminal sexual conduct, given that *any* of the felonies enumerated in MCL 750.316(1)(b) may constitute the predicate felony for felony murder. *Ream*, 481 Mich at 241. Thus, because the two offenses each contained an element the other did not, the Court concluded that they were not the same offenses and the defendant could be separately punished for each offense. *Id*. at 241-242.

The reasoning in *Ream* applies to this case. Felony murder requires the killing of a human being, *Carines*, 460 Mich at 759, an element that is not contained in first-degree child abuse. And an element of first-degree child abuse is causing serious physical or serious mental harm to a child, MCL 750.136b(2), which is not a necessary element of felony murder, given that *any* of the felonies enumerated in MCL 750.316(1)(b) may serve as the predicate felony for felony murder. See *Ream*, 481 Mich at 241. Hence, each offense contains an element that the other does not. It follows that a person can commit felony murder without committing first-degree child abuse and can commit first-degree child abuse without committing felony murder. Because each offense contains an element that the other does not, defendant's convictions and sentences for felony murder and first-degree child abuse do not violate the multiple punishments strand of the prohibition on double jeopardy.

## V. COUNSELING RECORDS

In her final argument on appeal, defendant argues that the trial court on remand abused its discretion in denying defendant's motion to subpoena JW's grief counseling records and that defendant was thereby denied her constitutional right to present a defense. After filing her appellate brief, defendant filed a motion to remand to the trial court to expand the record concerning a statement allegedly made by JW to a grief counselor on or around December 2010 indicating that JW saw Matchett kill GW. On May 22, 2014, this Court, while retaining jurisdiction, granted defendant's motion and remanded the case so that defendant could "request that the trial court issue a subpoena for records from the Children's Center of Wayne County." *People v Williams*, unpublished order of the Court of Appeals, entered May 22, 2014 (Docket

No. 311262). On remand, defendant filed a motion to subpoena the counseling records. Therein, she repeated the allegations made in her motion to remand. As she did in her motion to remand, defendant failed to provide affidavits; instead, she merely provided what appears to be a client intake form stating that JW's grandmother told JW's counselor that JW saw Matchett kill GW. In a written opinion and order, the trial court denied defendant's motion to subpoena the counseling records. In a supplemental brief on appeal, defendant challenges the trial court's decision.

"A trial court's decision regarding discovery is reviewed for an abuse of discretion." *People v Phillips*, 468 Mich 583, 587; 663 NW2d 463 (2003). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *People v Jackson*, 292 Mich App 583, 591; 808 NW2d 541 (2011). "[W]e review de novo the question whether a defendant was denied the constitutional right to present a defense." *People v Unger*, 278 Mich App 210, 247; 749 NW2d 272 (2008).

There is no general constitutional right to discovery in criminal cases. *People v Stanaway*, 446 Mich 643, 664; 521 NW2d 557 (1994). Nonetheless, "[d]efendants have a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment. Material has been interpreted to mean exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id*. at 666 (citations omitted).[5] The test for whether discovery items should have been provided to the defendant is whether they contain information that probably would have changed the outcome of the trial. *Id*., citing *Pennsylvania v Ritchie*, 480 US 39, 58; 107 S Ct 989; 94 L Ed 2d 40 (1987). See also *Ritchie*, 480 US at 57 ("Although courts have used different terminologies to define materiality, a majority of this Court has agreed, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (quotation marks and citation omitted). The materiality of the evidence is lessened if it does not contain significant new information. *People v Fink*, 456 Mich 449, 459-460; 574 NW2d 28 (1998).

In *Stanaway*, 446 Mich at 649, which, like the instant case, involved a defendant who sought counseling records possessed by a medical facility, our Supreme Court addressed "the difficult task of reconciling the state's compelling interest in protecting the confidentiality of counseling and juvenile diversion records with the defendant's federal and state constitutional rights to obtain evidence necessary to his defense in a criminal trial." The *Stanaway* Court held:

---

[5] There is no indication or claim that the prosecutor has possession of JW's grief counseling records; defendant contends that the records are in the possession of the Children's Center of Wayne County.

[W]here a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential to the defense. Only when the trial court finds such evidence, should it be provided to the defendant. [*Id*. at 649-650.]

"In general, when a discovery request is made disclosure should not occur when the record reflects that the party seeking disclosure is on a fishing expedition to see what may turn up." *Id*. at 680 (quotation marks omitted). A defendant must state a specific articulable fact to establish that the requested information is necessary to prepare the defense. *Id*. at 681. Absent a specific request, the defendant is fishing. *Id*.

Consistent with the holding in *Stanaway*, MCR 6.201(C) provides, in relevant part:

**(C) Prohibited Discovery.**

(1) Notwithstanding any other provision of this rule, there is no right to discover information or evidence that is protected from disclosure by constitution, statute, or privilege, including information or evidence protected by a defendant's right against self-incrimination, except as provided in subrule (2).

(2) If a defendant demonstrates a good-faith belief, grounded in articulable fact, that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense, the trial court shall conduct an in camera inspection of the records.

It is well recognized that "[a] criminal defendant has a state and federal constitutional right to present a defense." *Unger*, 278 Mich App at 250 (quotation marks and citation omitted). However, a criminal defendant's right to present evidence in her defense is not absolute. *Id*. A defendant's right may "bow to accommodate other legitimate interests in the criminal trial process." *Id*. (quotation marks and citation omitted). "Like other states, Michigan has a legitimate interest in promulgating and implementing its own rules concerning the conduct of trials." *Id*. "Our state has broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Id*. (quotation marks and citation omitted). A defendant's failure to present an argument that a particular rule is arbitrary or disproportionate to the purposes it was designed to serve, either in general or as applied to the facts of the case, comprises a failure to address the merits amounting to abandonment of the issue. *People v King*, 297 Mich App 465, 474; 824 NW2d 258 (2012).

In this case, the trial court did not abuse its discretion in denying defendant's motion to subpoena JW's counseling records. To the extent defendant is suggesting that the trial court violated this Court's remand order by failing to issue a subpoena, defendant is incorrect. This Court's order remanded the case "so that defendant-appellant may *request* that the trial court issue a subpoena for records from the Children's Center of Wayne County." *Williams*, unpublished order (emphasis added). This Court also directed the trial court "to make findings

of fact and a determination on the record." *Id*. By indicating that defendant on remand may *request* the issuance of a subpoena and by directing the trial court to make findings and a determination on the record, this Court's remand order did not *require* the issuance of a subpoena but directed the trial court to make a determination on the issue.

Defendant fails to cite or discuss the relevant case law and the court rule concerning the standards for obtaining review of privileged records. As such, defendant has not properly presented this issue for appellate review. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."). Further, defendant's argument is devoid of merit. Defendant asserts that her mother, Dorothy Gordon, received a report that JW told his grief counselor, Lara Bloom, during a therapy session at the Children's Center that he witnessed Matchett kill GW. Defendant has provided no affidavits of Gordon or Bloom to support this assertion. Defendant merely attached a "psychosocial assessment" form from the Children's Center's records, dated December 13, 2010; this form indicates that Gordon herself stated to the Children's Center that JW witnessed "her [sic] mom's boyfriend kill her [sic] younger brother." There is no indication on this form that JW, who was less than three years old at the time of the murder, actually made any such revelation to Bloom during his grief counseling session. The record offers no support for defendant's contention that the counseling records contain admissible evidence of any statements by JW implicating Matchett; defendant's claim is based on speculation about what the records might show. Given this lack of specificity, defendant has failed to demonstrate a good-faith belief grounded in articulable fact of a reasonable probability that the counseling records are likely to contain material information necessary to her defense.

Even if the counseling records did reflect such statements by JW, defendant offers no explanation concerning whether or under what hearsay exception these statements made by a toddler to Bloom would be admissible. Defendant fails to address the prosecutor's challenges to the reliability of JW's purported statement given his youth and his close relationship with Gordon, defendant's mother. Nor does defendant articulate how this evidence would undermine confidence in the outcome of the trial where defendant made numerous inconsistent statements to police and ultimately admitted that she threw GW on the date that he was fatally injured. Defendant's appellate presentation is inadequate. See *Kelly*, 231 Mich App at 640-641.

Finally, defendant has not established a violation of her constitutional right to present a defense. Defendant merely asserts that the jury may have been deprived of evidence that Matchett killed GW. This contention is speculative for the reasons discussed. Further, defendant fails to present an argument that a particular rule is arbitrary or disproportionate to the purposes it was designed to serve, either in general or as applied to the facts of the case; she has failed to address the merits of her constitutional claim, amounting to abandonment of the issue. *King*, 297 Mich App at 474. Defendant was afforded the opportunity to, and did in fact, present witnesses to testify in her defense at trial. She now seeks to subpoena records that apparently existed at the time of trial. Defendant offers no explanation concerning why she could not have sought to obtain or introduce evidence concerning JW's purported statements made in approximately December of 2010 at the time of her May 2012 trial. See *People v Rao*, 491 Mich 271, 283; 815 NW2d 105 (2012) (noting that in the context of a motion for new trial, a defendant who is aware of evidence before trial has the burden of using reasonable diligence to make the

evidence available and to produce it at trial). Defendant has not established a violation of her constitutional right to present a defense.

Affirmed.

/s/ Jane M. Beckering
/s/ Kathleen Jansen
/s/ Mark T. Boonstra